# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JAMES ROBINSON,     *

Plaintiff        *

v.            *     Civil Action No. ELH-18-2360

WEXFORD HEALTH, *et al.*  *

Defendants      *
            ***

## MEMORANDUM OPINION

Plaintiff James Robinson, a self-represented Maryland prisoner confined at the State's North Branch Correctional Institution ("NBCI"), filed this civil rights complaint against several defendants, claiming that they acted with deliberate indifference to his medical needs. ECF 1. Subsequently, he filed an Amended Complaint, which is substantially similar to the original Complaint. ECF 16.[1] The suit is supported by plaintiff's Declaration. ECF 16-2. Robinson seeks compensatory and punitive damages, and he includes other requests for relief.[2]

Warden Frank B. Bishop, Jr., defendant, has moved to dismiss or, in the alternative, for summary judgment. ECF 28. The motion is supported by a memorandum (ECF 28-1) (collectively, the "Warden Motion") and exhibits. Defendants Wexford Health Sources, Inc. ("Wexford"); Krista Self, N.P.; Stacie Mast, R.N.; Breauna Baker, R.N.; Holly Pierce, N.P., and Mahboob Ashraf, M.D. ("Medical Defendants") have filed a similar motion. ECF 32. It is

---

[1] Service has not been effected on defendant Alan Graves. Therefore, I shall dismiss the suit as to Graves, without prejudice.

[2] Plaintiff's motions for preliminary injunctive relief (ECF 4; ECF 20) were denied by Memorandum and Order of October 15, 2018. ECF 21; ECF 22.

supported by a memorandum (ECF 32-3) (collectively, "Medical Motion") and exhibits. Robinson was notified of his right to respond to the motions (ECF 29, ECF 33) but has failed to do so.

No hearing is needed to resolve these motions. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, I shall grant defendants' motions.

## I. Background

### A. Plaintiff's allegations

Plaintiff alleges that the health care providers at NBCI are not taking reasonable measures to guarantee his health and safety. ECF 16 at 2. He asserts that the "screening procedures [are] devastating most of the time they only spend an average of 15 to 30 seconds with each prisoner making cryptic notes of complaints." *Id.* Robinson also complains about delays in seeing a physician, scheduling follow up appointments and diagnostic tests, and unidentified individuals interfering with the medical appointments. *Id.* at 3, 5

Specifically, plaintiff alleges that he has not been provided with adequate medical treatment. He asserts:

> Now I been putting sick calls in for over a whole year now saying that I am having problems with something feeling like it move[s] inside my head, my nerves twitching way more then they suppose[d] to, migraines, my bones crack way more than they suppose[d] to, I barely [am] able to hear, my eyes [are] still swollen and bruised, I lost a lot of weight, my teeth then wore down so much they [are] almost completely gone, my gums [are] overlapping too much, my ears, nose & throat [are] sucking in make me choke, hard to breath[e] and swallow, my nuts in my balls [are] getting small and etc. but what have they actually done about it?

ECF 16 at 3 (some capitalization altered).

According to plaintiff, the Medical Defendants failed to follow up on referrals and orders for diagnostic testing. ECF 16 at 4. He asserts that if they believed that testing was necessary, as evidenced by their ordering it, they should have followed up to insure that he received it. *Id.* at 4, 5. He also alleges that the medications prescribed did not work and he needed medical treatment.

*Id*. at 7.

Additionally, plaintiff clams his food has been tampered with and that in 2016, "they got me to sign a life insurance policy." *Id*. at 3, 5. He claims that he should have been transferred to another facility based upon the "Intrasystem Transfer" summary paperwork from February 24, July 13, and September 14 of 2017. *Id*. at 7.

Plaintiff claims that he saw Dr. Graves regarding his teeth wearing down but Dr. Graves only smoothed his teeth and told him that the issue with his teeth was due to plaintiff grinding his teeth, which plaintiff disputed. ECF 16 at 6. Dr. Graves advised plaintiff that he would refer him to an outside specialist, but not until he had completed physical therapy for his jaw. *Id*. When plaintiff objected, Dr. Graves had plaintiff removed from the examination room without providing him with any dental care. *Id*.

### B.    Medical Defendants' Response

The Medical Defendants argue, *inter alia*, that they were not deliberately indifferent to any serious medical needs of Robinson. ECF 32-3 at 20. And, as to Wexford, they claim that it cannot be liable based on respondeat superior. *Id.* at 22. Defendants rely on their exhibits to support these contentions.

On June 18, 2016, plaintiff was involved in an altercation with another inmate and suffered extensive facial and head trauma, when he was 26 years of age. ECF 32-4 at 5, 7. Robinson was initially taken to Western Maryland Regional Medical Center ("WRMC") for treatment. *Id*. at 7-18. The CT scans of plaintiff's chest, abdomen, pelvis, and spine were normal. *Id*. at 10, 11. However, the CT of plaintiff's brain showed soft tissue injury. *Id*. And, the CT of plaintiff's face showed a depressed fracture of the left inferior orbital floor, with no evidence of blood within the left maxillary sinus. It was noted as a suspected chronic healing fracture. *Id*.

At WRMC plaintiff was combative with staff. *Id*. He was placed in high level care and provided analgesic medication. *Id*. at 12. He was diagnosed as suffering from a depressed fracture of the left inferior orbital floor, head injury, cervical strain, and blunt chest/abdominal injury. *Id*. He was transferred to the University of Maryland Shock Trauma due to the lack of ophthalmology staff at WMRMC. *Id*. at 6, 17, 18, 19-26.

At Shock Trauma, Robinson was also diagnosed with "swan neck deformity" of his right long finger, for which he was provided a splint. *Id*. at 25. He was discharged from Shock Trauma on June 20, 2017 (*id*. at 27-28) and admitted to the Western Correctional Institution infirmary for skilled care monitoring, where he remained until June 22, 2016. On that date, he was discharged back to the prison population. *Id*. at 29-32. When plaintiff was discharged he was described as uncooperative, banging on the door seeking discharge. *Id*. at 32. He offered no complaints of pain. *Id*.

Plaintiff was seen by Dawn Hawk, R.N. on July 5, 2016, due to plaintiff's complaint of a sore on his right foot, his belief that his right middle finger was broken, and left ear pain. ECF 32-4 at 33-34. Examination demonstrated that plaintiff's left ear was slightly swollen, but the ear canal was clear and no other abnormality was observed. *Id*. at 33. He had a small sore on his left foot, which was cleaned and treated. *Id*. Plaintiff's right middle finger was red, with a slight malformation. *Id*. He was able to move the finger and no swelling was observed. He was referred to a provider. *Id*. at 34.

The following day, plaintiff was seen by N.P. Krista Self (f/n/a Bilak). ECF 32-4 at 35-36. Plaintiff did not have any swelling or residual bruising but did have clicking on his left temporomandibular joint. *Id*. at 35. Plaintiff denied difficulty chewing or any pain but was

nevertheless prescribed Robaxin. *Id*.[3]

On August 18, 2016, plaintiff was seen by Self for complaints of hearing loss. ECF 32-4 at 37-38. Self submitted a consultation request for an audiology evaluation. *Id*. at 37. On October 13, 2016, Self discussed the results of the audiology evaluation with plaintiff. *Id*. at 40-41. The audiologist recommended a hearing aid for plaintiff's left ear (*id*.), which was issued by Self on December 12, 2016. *Id*. at 45.

Plaintiff was scheduled to see Dr. Ashraf on August 22, 2016, but refused to go to the clinic. ECF 32-4 at 39. He was rescheduled for one month. *Id*.

On October 21, 2016, plaintiff was evaluated by Nurse Evans after a use of force incident involving the administration of pepper spray. ECF 32-4 at 42.

Plaintiff's Robaxin prescription was discontinued on October 25, 2016, after he was found to be hoarding the medication. ECF 32-4, p. 44.

Nurse Evans saw Robinson on December 18, 2016, due to his complaints of a swollen face and that the bones in his face were "cracking." ECF 32-4 at 46. He was not in apparent distress. However, there was swelling on the left side of plaintiff's face, and he was referred to a provider. *Id*.

Robinson was evaluated by Nurse Buser on December 22, 2016, after a use of force episode involving pepper spray. ECF 32-4 at 48. Robinson was seen by NP Self on January 17, 2017, due to his complaint of "jumping" nerves and his stated need for an MRI. ECF 32-4 at 49. Plaintiff explained only that his "head [was] jumping around." *Id*. His examination was unremarkable, and he was assessed as having no unusual anxiety or depression. *Id*.

---

[3] Robaxin is a muscle relaxant which blocks nerve impulses or pain sensations sent to the brain. *See* https://www.drugs.com/robaxin.html (last visited August 29, 2019).

Nurse Hawk examined plaintiff on January 22, 2017, in response to a sick call slip he filed the previous day, stating that his nerves "jumped" and his bones cracked. ECF 32-5 at 51-53. He was unable to identify which nerves or bones he was referencing. *Id.* at 52. He complained that the left side of his face was still swollen. However, on examination, no swelling or markings were observed. *Id.*

NP Self again evaluated plaintiff on February 15, 2017. ECF 32-4 at 54-55. Plaintiff complained that he was sick, his bones were cracking, and his nerves were jumping, he was going brain dead, and needed a brain scan. *Id.* at 54. He was referred to Behavioral Health. *Id.*

On February 22, 2017, plaintiff was evaluated by Lauren Beitzel, LCPC. ECF 32-4 at 56-57. Plaintiff expressed "paranoia regarding his food being poison[ed], as well as a fixation on physical problems that do not exist." *Id.* at 56. He reported that his "nerves jump" and that his skin felt different although he could not explain how. *Id.* He also indicated his face felt swollen and his bones crack, and he complained that Beitzel was not acting right because she would not give him candy or a telephone call. *Id.* Correctional staff reported that plaintiff had components of impaired intellectual functioning and had been problematic before his assault by the other inmate and had been unable to keep cellmates. *Id.* Beitzel assessed plaintiff as "presenting with elements of a fictitious, body preoccupation" presenting in a manipulative nature. *Id.*

On March 6, 2017, plaintiff's Thyroid Stimulating Hormone Test ("TSH") results were elevated. ECF 32-4 at 58.[4] Additional laboratory tests were ordered to reevaluate. *Id.* The results were received on June 16, 2017, and showed that plaintiff's T4 was normal and his T3 was slightly low. *Id.* at 72-73.

---

[4] TSH is a test that measures hormone levels in order to evaluate whether the thyroid if functioning properly. *See* https://medlineplus.gov/lab-tests/tsh-thyroid-stimulating-hormone-test/ (last visited August 29, 2019).

On March 24, 2017, custody staff requested NP Self see plaintiff due to his complaints of bones cracking, nerves jumping, and his brain dying. ECF 32-4 at 59-60. She noted that plaintiff had been evaluated on a number of occasions regarding these complaints and no medical reason for his symptoms had been identified. *Id*. at 59. His physical examination was unremarkable, and he was again referred to psychology. *Id*.

Plaintiff was seen by Nurse Mast on April 25, 2017, in response to his complaints of his eye twitching and nerve pain. ECF 32-4 at 61-62. At the time of exam, he had no active complaint of pain and no twitching was observed. Although plaintiff had slight swelling of the left eye lid, there was no bruising or drainage. *Id*. at 61. Plaintiff advised Mast that he wanted to have left eye surgery, which he claimed he refused when he was taken to Baltimore for his head trauma. *Id*. He was referred to a provider. *Id*.

On April 27, 2017, plaintiff was seen by NP Self. ECF 32-4 at 63-64. He continued to complain of muscle twitching. *Id*. at 63. His lab results were reviewed, and the physical exam was normal. *Id*.

Plaintiff was evaluated by Nurse Evans on April 29, 2017, as a result of an altercation between plaintiff and custody staff. ECF 32-4 at 65-66. Plaintiff had superficial lacerations on his lips and knees. *Id*. at 65. He was wearing a spit mask and admitted that he spat on the officers. *Id*. He refused to have his abrasions treated and threatened to spit on nurses if they did not start taking care of his medical issues. *Id*.

Robinson submitted a sick call slip on May 7, 2017, complaining of cracking bones, jumping nerves, that his nose felt like it was "sucking in", his stomach growled, and his brain was loose and moving. ECF 32-4 at 67. He was seen by Nurse Baker on May 9, 2017. *Id*. at 68-69. He was seen by NP Self on May 12, 2017, raising the same claims regarding bones cracking and

nerves jumping and also complaining that his hair was falling out. *Id*. at 70. His examination demonstrated that he had full range of motion, no crepitus in any joints, and no balding spots on his scalp. *Id*. He was encouraged to discuss his complaints with Behavioral Health. *Id*. He appeared anxious and paranoid and reported that he was being poisoned. NP Self assessed plaintiff as anxious, exhibiting compulsive behavior, having obsessive thoughts, exhibiting poor insight and judgment, and having poor attention span and concentration. *Id*. He was referred to Behavioral Health for anxiety and paranoia. *Id*. at 71.

On August 14, 2017, plaintiff was seen by Nurse Shively in response to his complaints of "headaches, dizziness, fatigue, memory failure, weight loss and lack of focus, [and] problems with his nerves." ECF 32-4 at 74. He asked to be admitted to the infirmary and refused to leave the medical department. He also denied that he had previously refused medical appointments. *Id*. He was escorted back to his cell by custody staff. *Id*.

Nurse Self saw plaintiff again on August 18, 2017. ECF 32-4 at 76. He complained that his teeth were decaying but reported no pain. *Id*. NP Self referred plaintiff to dental. *Id*.

Plaintiff also complained that he had a concussion but denied any recent injuries and no bruising or injuries were observed. *Id*. He complained that his head was "messed up" and NP Self encouraged him to see Behavioral Health. *Id*. He continued to complain that his nerves were jumping and his bones were cracking. However, no crepitus was observed. Robinson erroneously claimed that he had a cauliflower ear. *Id*. In addition, he complained of weight loss, but there was no significant weight loss observed. *Id*. Ultimately, plaintiff became loud and cursed and lunged at NP Self, necessitating his removal by custody staff. *Id*.

Plaintiff was evaluated by Dr. Ashraf on August 28, 2017. ECF 32-4 at 78-79. He complained of nerve pain. *Id*. at 78. Examination showed no symptoms of weakness, however

plaintiff was assessed as being positive for neck stiffness, back pain, bone and joint symptoms, and rheumatologic manifestations. *Id*. His examination was otherwise unremarkable. *Id*. He was prescribed Robaxin and Ibuprofen. *Id*. at 79.

On September 7, 2017, plaintiff was seen by Nurse Hawk after a use of force incident with custody staff. ECF 32-4 at 80. Plaintiff reported a right foot injury, but refused to elaborate. *Id*. No injuries were observed on plaintiff's foot. *Id*. There was no swelling, redness, or malformation. *Id*. But, he had mild swelling and redness to his left eye, with no bruising or open areas. *Id*. Plaintiff began to yell, and the examination was ended. *Id*.

Robinson returned for a second assessment after a second use of force incident later that day, and complained of an injury to his right big toe, but no injury was observed. *Id*. Plaintiff was described as off topic and he would not answer questions and was returned to a holding cell. *Id*.

Nurse Mast evaluated plaintiff on September 30, 2017, due to complaints of cauliflower ear, brain concussion, swollen eye, broken feet, and a numb hand. ECF 32-4 at 81. He wanted to be sent to the infirmary or hospital. *Id*. At the time of examination he was not in distress, he did not complain of pain, and his exam was unremarkable. *Id*.

Robinson was evaluated by Nurse Lease on November 13, 2017, regarding his complaint that his bones cracked and something was moving in his head. ECF 32-4 at 83. He was able to walk with a steady gait and get on and off the examination table without difficulty. His neurological exam was normal. *Id*. Plaintiff denied refusing provider visits on November 8 and 11, 2017. *Id*. He was referred to a provider. *Id*.

On November 22, 2017, plaintiff was seen by Nurse Mast for his concerns that he had a concussion and elevated TSH. ECF 32-4 at 85. Plaintiff expressed his belief that there was a pill to heal a concussion and Mast educated him regarding concussions and how they heal. *Id*.

Nurse Baker evaluated plaintiff on November 29, 2017. ECF 32-4 at 87. Plaintiff complained of a left swollen big toe, hand numbness, and about his TSH levels. *Id.* He refused to take off his shoe to have his toe examined, however. *Id.* Baker noted that plaintiff's last labs were drawn in June of 2017. *Id.*

Plaintiff was seen by Nurse Mast on December 3, 2017, at sick call, where he expressed concern that his throat was "sucking in" and also expressed concern about his TSH levels. ECF 32-4 at 89. Robinson reported that he did not have any trouble eating or swallowing. *Id.* He was advised that his last two TSH draws were normal. *Id.*

Robinson was seen by Nurse Baker on December 8, 2017, raising identical concerns about his throat "sucking" and TSH levels. *Id.* at 91. He did not have any difficulty speaking, swallowing, or eating. He was once again advised that his TSH levels were normal. *Id.* He was also advised that he was scheduled to see a provider. *Id.* Plaintiff became unhappy and was escorted out by custody staff. *Id.*

On December 18, 2017, plaintiff was seen by Nurse Hawk for complaints of blurry vision. ECF 32-4 at 93. During the visit he complained that his eyes were sucking into his skull and his teeth were shrinking. *Id.* His teeth appeared normal in size. *Id.* The sick call slip was referred to optical. *Id.* Nurse Hawk reported that plaintiff was not amenable to education. *Id.*

On December 27, 2018, plaintiff was seen by Nurse Mast at sick call for complaints that his brain was moving in his head and leaking out. ECF 32-4 at 95. He did not report any pain and could move all of his extremities without difficulty. He was not dizzy, had no memory loss, and was able to remember past and present. He was provided information regarding concussions but became loud and insisted he be given a pill to treat his concussion. *Id.* He also complained that his eye was painful and swollen, but no swelling was observed. *Id.* Again, plaintiff had to be escorted

from the encounter by custody. *Id.*

The following day, plaintiff was seen by Nurse Hawk at sick call, complaining of blurry vision and a swollen eye due to a brain concussion. ECF 32-4 at 97. He was advised that he was being referred to optical for his vision problem. *Id.*

On December 29, 2017, plaintiff was evaluated by NP Self after a use of force incident involving custody staff. ECF 32-4 at 99-100. He denied any injury and refused to be examined or have his vital signs taken. *Id.* at 99. He was seen by Nurse Lease on January 16, 2018, after another use of force incident, this one involving the use of pepper spray. ECF 32-4 at 101. Plaintiff complained that his right arm hurt and a 10 x 2 centimeter skin tear and multiple superficial scratches were cleaned and bandaged. *Id.*

Plaintiff refused to be seen by Dr. Ashraf on February 6, 2018. ECF 32-4 at 102. He was to be rescheduled within one week. *Id.*

Plaintiff was evaluated by Nurse Mast on February 12, 2018, after a use of force incident involving pepper spray. ECF 32-4 at 103. Plaintiff's vital signs were taken. He was assessed as stable and released to custody to be taken to a decontamination shower. *Id.* Three days later he was seen by Nurse Mast after another use of force incident. *Id.* at 104. Plaintiff was handcuffed and was wearing a spit mask. *Id.* He complained that his brain was moving, and he needed to be treated for a concussion. He was referred to a provider. *Id.* The following day, he refused to be seen by Dr. Ashraf. *Id.* at 105.

On February 27, 2018, plaintiff was seen by Laruen Beitzel, LCPC. ECF 32-4 at 106-107. He was referred by his housing unit manager due to the multiple use of force incidents. *Id.* Plaintiff advised that he would do whatever it took to be taken to the hospital. *Id.* He complained that after the 2016 inmate assault he suffered a concussion and things moved in his head, he had jerking

nerves, and cracking bones. Beitzel noted that plaintiff had been seen by multiple medical providers and, from August of 2017 to February of 2018, he refused 6 medical passes. *Id*.

Plaintiff indicated he understood that continued use of force incidents could worsen his reported conditions or cause additional injury and that heightened transportations restrictions would make outside trips less likely. *Id*. Although he complained his teeth were shrinking, there were no visible gaps. *Id*. He complained of weight loss but his medical records reflected a 15 pound difference, which plaintiff attributed to tampering with the scale. *Id*. He was assessed with overtones of paranoia and odd thinking, possibly due to post-concussion syndrome. *Id*. A patient care conference was requested. *Id*.

On March 5, 2018, plaintiff was seen by Holly Pierce, N.P. regarding his complaints that he was unhappy with his new eye glasses. ECF 32-4 at 108. He indicated he wanted to a new pair of glasses but only if there was no charge. *Id*. He denied that his vision was blurry and declined any assessment. *Id*.

Plaintiff was seen by Nurse Lease on March 13, 2018, due to complaints of anxiety and that he needed his thyroid checked. ECF 32-4 at 109. He was advised that his last two thyroid tests were normal and that there was no reason to repeat them. *Id*. He complained that he weighed 190 pounds in 2016 and Lease reassured him that a 14 pound weight loss over two years was not unhealthy. *Id*. He became agitated and claimed that he ground his teeth at night. *Id*. Plaintiff was advised to see dental. *Id*. He grew more agitated and screamed that his food was being poisoned. *Id*. He was escorted out of medical by custody due to safety concerns. *Id*.

On April 4, 2018, plaintiff was seen by NP Pierce concerning complaints of dizziness, poor hearing, something moving inside his head, and ear, nose and throat discomfort. ECF 32-4 at 111. He described the discomfort as a sucking feeling. His examination was unremarkable.

Nevertheless, labs were ordered. *Id*. at 112.

Robinson was seen by Nurse Mast on April 12, 2018, after a use of force incident involving pepper spray. ECF 32-4 at 113. He had slight redness to his face. *Id*. He denied any injury, other than something moving around in his head. *Id*. He was released to custody. *Id*. He was returned to medical due to a second use of force later that day. *Id*. His face had bruising and bleeding on the right side. The wound was cleaned and disinfected and plaintiff was returned to custody. *Id*.

On April 22, 2018, plaintiff was seen by Nurse Cottrell during segregation rounds. ECF 32-4 at 114. He complained that he had an object lodged in his throat which obstructed his airway. *Id*. He was standing at the cell door, oriented with clear speech and even and unlabored breathing. *Id*. He appeared in no distress. *Id*. He had been seen eating his breakfast without obvious complications. *Id*. He asked about a thyroid test and was told that a call was placed for him to be seen by a provider. *Id*.

Plaintiff was seen later that day by Nurse Buser due to a use of force occurrence involving pepper spray. *Id*. at 115. He was found laying on his stomach in the medical room, yelling, fighting, and spitting. But, when asked, he reported no injuries to the nurse. *Id*.

On May 17, 2018, plaintiff refused to be seen by LCPC Beitzel for follow up. ECF 32-4 at 116. She reported that he had recently refused scheduled lab work as well as physical therapy sessions and staff reported his continued non-compliance. *Id*. She noted that no significant behavioral issues were documented in the confinement sheets. *Id*.

On May 29, 2018, plaintiff was evaluated by Nurse Opel after a use of force incident involving his extraction from his cell. ECF 32-4 at 117. Plaintiff was described as agitated and non-cooperative. *Id*. He reported that he flooded his cell because he was concerned about the amount of weight he lost. He denied any wounds or injuries that may have occurred during the

extraction. *Id*. It was noted that medical records showed plaintiff lost 20 pounds in the previous six months and his most resent TSH level, drawn on June of 2017, was low. *Id*. He was scheduled to see the provider regarding his weight loss. *Id*.

On July 15, 2018, plaintiff was seen by Nurse Klepitch regarding his complaints that his food was poisoned and custody and medical staff were out to get him. ECF 32-4 at 120. Plaintiff was described as having a "flight of ideas" and appeared paranoid. *Id*. He stated that he had not been eating and that his lab work from last month was a lie and medical staff were poisoning him. *Id*. On examination, plaintiff's teeth were described as yellow and possibly loose, his gums and lips were dry and parched, and his neck emaciated. *Id*. Nurse Klepitch referred plaintiff to a provider and to dental. *Id*.

NP Pierce examined plaintiff on July 20, 2018. ECF 32-4 at 122. Plaintiff again reported that since an altercation in 2016 he suffered on-going facial swelling, discoloration of his eyes, nerve twitching and pain, cracking bones, the feeling that something was moving in his head, and painful teeth. *Id*. He also reported being diagnosed with a brain tumor and that no one was treating his medical needs. *Id*. "He then got up and left the exam room." *Id*. Pierce ordered x-rays of plaintiff's face and neck. *Id*.

A facial x-ray was taken on July 24, 2018, which showed no acute fracture, dislocation, or subluxation. *Id*. at 124. The alignment was anatomical and the sinuses were described as well aerated without air-fluid levels. *Id*. The neck x-ray taken the same date showed no significant abnormality. *Id*.

On August 23, 2018, Nurse Munday saw plaintiff due to a use of force incident involving pepper spray. ECF 32-4 at 126. Plaintiff denied any injuries. *Id*. He was seen on September 28, 2018, by Travis Barnhart, LPN, due to another use of force incident with pepper spray after

plaintiff spit blood on custody staff. *Id.* at 127. Plaintiff was handcuffed behind his back and wearing a spit mask when examined. He was in no apparent distress and did not complain of any injuries. He requested to go to the hospital and demanded to see a provider regarding his past complaints. *Id.*

The following day, Robinson was seen by Nurse Buser regarding another use of force which involved a cell extraction and the use of pepper spray. *Id.* at 128. Plaintiff was handcuffed behind his back and was wearing a spit mask. *Id.* He stated that he had no injuries but that he hurt all over. *Id.*

Robinson was seen on October 15, 2018, by Nurse Shively in response to another use of force. *Id.* at 129. Plaintiff walked to medical without difficulty and his examination was within normal limits. He did not report suffering any injuries during the use of force. *Id.*

On October 18, 2018, plaintiff was seen by Nurse Klepitch regarding his complaints that he was grinding his teeth and had abnormal TSH lab work. ECF 32-4 at 130. Klepitch explained to plaintiff that his TSH was within normal limits, as was his PSA, and that there was no indication for treatment or medication at that time. *Id.* He referred plaintiff to dental. *Id.*

Asresahegn Getachew, M.D. avers that plaintiff showed no clinical evidence of concussion subsequent to the altercation of June 18, 2016, or any indication of new trauma to the brain. ECF 32-5, ¶ 6. Moreover, there was no medical reason for plaintiff's symptoms and no clinical confirmation of his symptoms. *Id.* He was referred to Behavioral Health for the treatment of his symptoms. *Id.* Dr. Getachew opines that the Medical Defendants provided appropriate medical care for plaintiff's reported symptoms. *Id.*, ¶¶ 6-9.

Additionally, Dr. Getachew explains that Release of Responsibility forms call for two people to witness an inmate's refusal to attend medical care when the inmate refuses to sign or is

not available to sign. ECF 32-5, ¶ 10. HIPPPA privacy regulations require the signatures to be from medical staff. During medical rounds on housing tiers, the medical provider is escorted by custody staff and, as such, there is only one medical person available to document an inmate's refusal of care. *Id.*

**C. Warden's Response**

The Warden argues, *inter alia*, that he was not personally involved in any of the alleged wrongdoing, and thus has no liability under 42 U.S.C. § 1983. ECF 28-1 at 5-8. In any event, he contends that plaintiff received constitutionally adequate medical care. *Id.* at 8-11. Moreover, he maintains that he is entitled to qualified immunity. *Id.* at 4-5.

## II. Standard of Review

Defendants' motions are styled as motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed App'x. 220, 222 (4th Cir. 2016) (per curiam). However, when the movant expressly captions its motion "in the alternative" as one for

summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[5]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the

---

[5] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *Id*. (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F.Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F.Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. And, a court "should hesitate before denying a Rule 56(d) motion

when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Plaintiff has not requested discovery. And, the defendants have submitted numerous exhibits, including medical records. As such, I am satisfied that it is appropriate to address the motions as ones for summary judgment, because doing so will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002); *see Roland v. U.S. Citizenship & Immigration Servs*., 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of

conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III. Discussion

#### A. Section 1983

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Graves v. Loi*, 930 F.3d 307, 318-19 (4th Cir.

2019); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied,* 135 S. Ct. 1983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert*. *denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative

factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

## B. Deliberate Indifference

The Eighth Amendment protects the rights of convicted prisoners. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting *Ingraham v. Wright,* 430 U.S. 651, 671 n.40 (1977)). It prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). And, "[i]t is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'" *Gordon v. Schilling*, ___ F.3d ___, 2019 WL 4179813, at *6 (4th Cir. Sept. 4, 2019) (citation omitted).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir.

2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).

In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failure to protect inmates from attack, inhumane conditions of confinement, and failure to render medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson*, 501 U.S. at 303; *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). Moreover, "[t]he necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica v. Aylor,* 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*).

The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38); *see Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

For a plaintiff prisoner to prevail in a suit alleging the denial of adequate medical care, the defendant's actions or inaction must amount to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Lightsey*, 775 F.3d at 178; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228.

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and that, subjectively, the defendant was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer*, 511 U.S. at 837; *see also Gordon*, 2019 WL 4179813, at *7; *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King*, 825 F.3d at 219. As the *Heyer* Court put it, "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." *Heyer*, 849 F.3d at 209-10.

The subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Put another way, "it is not enough that the defendant *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*); *see Farmer*, 511 U.S. at 839-40; *Anderson v. Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017).

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot

be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mount Ranier,* 238 F.3d 567, 575-76 (4th Cir. 2001) ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.").

A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge. And, the plaintiff can rely on circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842); *see also Gordon*, 2019 WL 4179813, at \*7; *Scinto*, 841 F.3d at 225.

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial *risk* of serious harm.'" *Heyer*, 849 F.3d at 210 (quoting *Farmer*, 511 U.S. at 837) (emphasis added in *Heyer*); *see Thompson*, 878 F.3d at 97-98. But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014); *see De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013).[6]

---

[6] The Supreme Court has rejected the "significant injury" requirement in regard to an excessive force claim under the Eighth Amendment. *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) (per curiam); *see Danser*, 772 F.3d at 346 n.8 (distinguishing deliberate indifference claims).

The Supreme Court recognized in *Farmer* that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. at 844; *accord Brown*, 240 F.3d at 390-91. The Constitution requires prison officials to ensure "reasonable safety," a standard that acknowledges prison officials' "unenviable task of keeping [sometimes] dangerous [people] in safe custody under humane conditions[.]" *Farmer*, 511 U.S. at 845 (citations and quotation marks omitted). Accordingly, "prison officials who act reasonably cannot be found liable" under the deliberate indifference standard. *Id.*; *see also Short v. Smoot*, 436 F.3d 422, 428 (4th Cir. 2006) (finding that an officer who responds reasonably to a danger facing an inmate is not liable under the deliberate indifference standard, even when further precautions could have been taken but were not); *Brown*, 240 F.3d at 390-91.

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). In *Estelle*, 429 U.S. at 106, the Supreme Court said: "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."

What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *cert. denied,* 529 U.S. 1067, (2000), is also pertinent: "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate

consequences . . . ." *See also Young*, 238 F.3d at 576 (stating that a Fourteenth Amendment deliberate inference claim requires more than a showing of "mere negligence"); *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998) ("[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference.").  Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835).

Of course, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice*, 58 F.3d at 105.  But, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012); *Lopez v. Green*, PJM-09-1942, 2012 WL 1999868, at * 2 (D. Md. June 3, 2012); *Robinson v. W. Md. Health Sys. Corp.*, DKC-10-3223, 2011 WL 2713462, at *4 (D. Md. July 8, 2011). And, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

## C.  Warden Bishop

Plaintiff does not assert that Warden Bishop was personally involved in the matters alleged. Instead, plaintiff seeks to hold the Warden liable for failing to supervise or properly train his

subordinates.

To state a claim for supervisory liability in a §1983 action, plaintiff must plead facts demonstrating that Warden Bishop had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to him, that their response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and that there is a causal link between the supervisor's inaction and the particular constitutional injury suffered. *Shaw*, 13 F.3d at 799.

The Complaint fails to allege facts to satisfy this standard. And, on the merits, the exhibits submitted by the Warden establish that there is no basis for plaintiff's claims of constitutionally inadequate medical care, nor is there any basis for supervisory liability as to the Warden.

### D. Medical Defendants

The evidence, viewed in the light most favorable to plaintiff, establishes that he received constitutionally adequate medical care. No evidence exists that the Medical Defendants' alleged conduct amounted to deliberate indifference. *See Estelle*, 429 U.S. at 105-06 (holding that an inadvertent failure to provide adequate medical care does not amount to deliberate indifference). Indeed, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Collins*, 766 F.2d at 849 (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)).

No exceptional circumstances exist here. To the contrary, after the 2016 altercation, plaintiff was taken to an outside hospital for treatment, where he received numerous diagnostic tests as well as analgesic pain medication. When he returned to the institution he was placed in the infirmary for observation and ultimately returned to his housing unit. Thereafter, plaintiff's complaints of various symptoms were addressed repeatedly by a variety of medical providers,

including nurses, nurse practitioners and physicians. He was provided analgesic pain medication, as well as additional diagnostic testing. Regularly, plaintiff was abusive to staff, refused to attend scheduled medical appointments, and refused to cooperate with examinations. When no medical reason was found for plaintiff's reported symptoms he was referred to Behavioral Health for additional diagnosis and treatment. On this record, it is clear that defendants were not deliberately indifferent to plaintiff's medical needs.

Additionally, plaintiff makes no direct allegations against Wexford. Instead, he seeks to hold Wexford liable for the actions of its employees. As noted, the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no respondeat superior liability under § 1983). Rather, liability of supervisory officials is "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw*, 13 F.3d at 799 (citations omitted). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Plaintiff has failed to plead or demonstrate sufficient facts showing supervisory indifference to, or tacit authorization of, any misconduct by Wexford's employees. As discussed above, plaintiff failed to show that his constitutional rights were violated. Accordingly, he has necessarily failed to demonstrate that Wexford authorized or was indifferent to any such violation. Plaintiff's assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See id.* ("Generally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse."). Therefore, Wexford is also entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, defendants' motions will be GRANTED.[7] A separate Order follows.

September 6, 2019                                   _____/s/_____
Date                                                      Ellen L. Hollander
                                                          United States District Judge

---

[7] Having found no Eighth Amendment violation, the court need not address the defendants' other defenses.